**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara A. (Dunne) Kohnert, | No. CV-05-2271-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| JoAnne B. Barnhart, Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Barbara A. (Dunne) Kohnert seeks judicial review of the Administrative Law Judge's ("ALJ") decision denying her claim for Disability Insurance Benefits.  42 U.S.C. § 405(g).

PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423 and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382, alleging disability since August 21, 2001 due to injuries in both hands, panic attacks, episodes of vertigo, and migraine headaches. Plaintiff's application was denied initially and on reconsideration.  Plaintiff requested a hearing and a hearing was held on January 14, 2004 and April 15, 2004.  On May 10, 2004, the Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was disabled and eligible for disability benefits for a period between August 21, 2001, through September

1    18, 2002, but not from or after September 19, 2002.  Thus, Plaintiff was entitled to a closed

2    period of disability and Disability Insurance Benefits under Section 216(i) and 223(a),

3    respectively, of the Social Security Act, and was eligible for a limited period of Supplemental

4    Security Income under Sections 1602 and 1614(a)(3)(A) of the Act.  Plaintiff sought review

5    of the ALJ's decision.  The Appeals Council did not grant Plaintiff's request for review and

6    the decision became final.  Plaintiff commenced an action for review in this Court pursuant

7    to 42 U.S.C. §§ 405(g) and 1383(c).

8         Plaintiff timely filed a Complaint for judicial review in this Court. (Doc.1).  Defendant

9    has filed an Answer and a certified copy of the transcript of record.  (Doc. 4).  Plaintiff has

10   filed a Motion for Summary Judgment (Doc. 12) supported by an attached Statement of Facts

11   and supporting Brief.  Defendant has filed Response to Plaintiff's Motion for Summary

12   Judgment (Doc. 13), and a Cross-Motion for Summary Judgment (Doc. 14) supported by a

13   Statement of Facts (Doc. 15) and Memorandum of Points and Authorities (Doc. 16).  Plaintiff

14   has filed a Response to Defendant's Cross-Motion for Summary Judgment and a Reply to

15   Defendant's Response to Plaintiff's Motion for Summary Judgment.   (Doc. 25).

16                          STANDARD OF REVIEW

17        This Court must affirm the ALJ's findings if they are supported by substantial

18   evidence and free from reversible legal error.  Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir.

19   1990).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence

20   as a reasonable mind might accept as adequate to support a conclusion."  Richardson v.

21   Perales, 402 U.S. 389, 401 (1971); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

22        In determining whether substantial evidence supports a decision, the Court considers

23   the record as a whole.  Richardson, 402 U.S. at 401; Tylitzki v. Shalala, 999 F.2d 1411, 1413

24   (9th Cir. 1993).  If there is sufficient evidence to support the ALJ's determination, the Court

25   cannot substitute its own determination.  Young v. Sullivan, 911 F.2d 180, 184 (9th Cir.

26   1990).  Where evidence is inconclusive, "questions of credibility and resolution of conflicts

27   in the testimony are functions solely of the [Commissioner]."  Sample v. Schweiker, 694 F.2d

28                                   - 2 -

639, 642 (9th Cir. 1982).  Therefore, if on the whole record before the Court, substantial evidence supports the Commissioner's decisions, this Court must affirm.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C. § 405(g).

An ALJ determines an applicant's eligibility for disability benefits through the following five steps:

(1)    determine whether the applicant is engaged in "substantial gainful activity";

(2)    determine whether the applicant has a "medically severe impairment or combination of impairments";

(3)    determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4)    if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant is capable of performing his or her past relevant work;

(5)    if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)).  See 20 C.F.R. § 416.920. At the fifth step, the burden of proof shifts to the Commissioner. Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

BACKGROUND

I.    GENERAL BACKGROUND

Plaintiff was born on August 16, 1956 and was 47 years of age at the time of the administrative hearings (Transcription of the certified administrative record filed with this Court by Defendant on January 3, 2006 (hereinafter "Tr.") 119).  Plaintiff graduated from high school and earned an Associate of Arts degree in Special Education and psychology (Tr. 345).  Plaintiff's relevant past work includes that of a special education aide, a home care provider, and a receptionist (Tr. 94).  Plaintiff is left-hand dominant (Tr. 344).  Plaintiff alleges that she became disabled on August 21, 2001 and continues to be disabled because

of an injury to her right hand on that date, together with the residual effect of a 1996 injury to Plaintiff's left hand, and on-going occurrences of migraine headaches, panic attacks, and vertigo (Tr. 85, 347-48). Plaintiff voluntarily stopped driving three years before the hearing due to panic attacks and vertigo (Tr. 344).

Plaintiff was injured in a motor vehicle accident on May 24, 1996. (Tr. 225). The Thunderbird Samaritan Medical Center emergency department records of the incident (Tr. 225-27) indicate that Plaintiff sustained "a minuscule chip fracture in an otherwise undisturbed left fifth metacarpophalangeal [finger] joint" (Tr. 226).

On July 1, 1996, Frederick Meyer, M.D., of Hand Surgery Associates, P.C., examined Plaintiff and determined that Plaintiff appeared "to have multiple symptoms of ulnar[1] sided wrist pain, but her area of maximum tenderness . . . [appeared] to be insertion of the extensor carpi ulnaris." (Tr. 262). Dr. Meyer placed Plaintiff in a short arm cast with an outrig to immobilize the three ulnar digits (Tr. 262). On July 22, 1996, Plaintiff returned to Dr. Meyer due to experiencing "a great deal of pain." (Tr. 260). Dr. Meyer proscribed a removable wrist splint, began Plaintiff on physical therapy, and referred her for an magnetic resonance imaging scan ("MRI") bone scan (Id.). On September 23, 1996, Dr. Meyer informed Plaintiff that the MRI was "basically normal," but scheduled an arthroscopy due to Plaintiff's "moderate to marked amount of wrist pain." (Tr. 258). The arthroscopy was performed on October 25, 1996, and it revealed ulnar osteochondral fragments, which were evacuated without complications (Tr. 231). During this time, Planitiff was undergoing physical therapy twice a week and working full time (Tr. 256).

---

[1] "Ulnar" means "of or relating to the ulna – the "bone on the little-finger side of the human forearm that forms with the humerus the elbow joint and serves as a pivot in rotation of the hand." Medline Plus by Merriam-Webster (1995) http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=ulnar (last visited January 16, 2007).

On December 16, 1996, Dr. Meyer determined that stressed x-rays showed a tendency of ulnar to impact against her carpus (Tr. 256). Dr. Meyer assessed Plaintiff as having a 35 percent impairment rating of the [left] upper extremity (Tr. 255). On January 27, 1997, Plaintiff returned to Dr. Meyer still experiencing pain in her [left] wrist, stating she took one Naproxyn a day which helped relieve the pain (Tr. 254). Plaintiff also stated that she had shoulder pain, which dated back to the 1996 auto accident (Tr. 254). Dr. Meyer did not detect a shoulder sublux on examination, but assessed a possible rotator cuff tear in her left shoulder, and ordered an MRI (Tr. 254). The shoulder MRI was essentially normal (Tr. 253). On February 17, 197, Dr. Meyer found a ganglion cyst on Plaintiff's right dorsal wrist, which he successfully aspirated (Tr. 253).

On March 3, 1997, Mitchel Lipton, M.D., examined Plaintiff after she was referred to him for insurance purposes relating to Plaintiff's 1996 auto accident (Tr. 246-51). Dr. Lipton opined that Plaintiff was not stationary and should be weaned off her splint in an effort to improve her 35 percent impairment rating. (Tr. 251). Dr. Lipton noted that Plaintiff believed "her left wrist will not get better, and, frankly, if she continues to maintain that belief, it probably won't get better" (Id.). Plaintiff was advised to establish a positive outlook and recommended returning to the gym and suggested non-stressful strengthening activities, such as swimming or tai chi, graduating to light resistance exercises as the left wrist pain diminishes (Id.) On March 17, 1997, Dr. Meyer took note of Dr. Lipton's opinion (Tr. 253).

On August 18, 1997, Peter J. Campbell, M.D., an associate of Dr Meyer's at Hand Surgery Associates, P.D., examined Plaintiff. (Tr. 252) Dr. Campbell aspirated the ganglion cyst that had recurred on her right wrist (Id.).

On November 3, 1997, Leonard S. Bodell, M.D., examined Plaintiff's left wrist and left shoulder (Tr. 156-59). Dr. Bodell found that Plaintiff had limited left wrist motion and left forearm rotation with no obvious evidence of diastrophic changes (Tr. 157). Dr. Bodell summarized Plaintiff's accident and surgical history, noting she had developed "the equivalent of an ulnar impaction syndrome and perpetula pain and arthrofibrosis of the wrist"

(Tr. 156-57). Dr. Bodell examined Plaintiff and found that she demonstrated limited left wrist motion with significant limitation of forearm rotation and decreased grip strength (Tr. 157). Dr. Bodell noticed that Plaintiff's left shoulder defined an area of glenohumeral, not subacromial, crepitus but did not sublux, which led Dr. Bodell to suspect a possible SLAP lesion (pertaining to the scaphoidlunate ligament) (Id.). Dr. Bodell concluded that Plaintiff's impairment was permanent, not expected to lessen over time, and more likely to become magnified as "arthritic pain" as it progresses (Tr. 158). Dr. Bodell also stated that Plaintiff's right wrist problems were likely caused secondarily by the 1996 auto accident, as Plaintiff overused her right wrist to compensate for her limited-functioning left wrist (Id.).

On December 5, 1997, Plaintiff visited Matthew Conklin, M.D., for an evaluation of surgical treatment of Plaintiff's right wrist problems, including carpal tunnel syndrome and a dorsal ganglion that had been aspirated twice (Tr. 326-27). Dr. Conklin advised Plaintiff that a deeper structure, such as a scapholunate ligament (the ligament between the scaphoid and lunate, or crescent, bones of the wrist) likely was causing her pain, and that rehabilitation for carpal tunnel and ganglion excision contradict each other (Tr. 326). Nevertheless, Plaintiff wished to proceed with both surgeries and advised that she would participate diligently in the doctor's recommended rehabilitation program (Tr. 326-27).

On December 12, 1997, Dr. Conklin performed a carpal tunnel release and dorsal ganglion excision on Plaintiff's right wrist (Tr. 263-64). Upon release of the ligament, the nerve appeared to be healthy, the carpal canal was intact, without specific pathology, and there was no tenosynovitis, although, upon release, there was a generalized bulge to the contents of the carpal canal (Tr. 263). In a December 16, 1997 followup visit, Dr. Conklin reported that Plaintiff was doing very well and that both wounds were healing nicely (Tr. 325). Dr. Conklin stated that he would like Plaintiff to slowly but surely increase her activity (Tr. 325).

1    On August 13, 2001, Dr. Conklin examined Plaintiff for complaints of <u>left</u> hand pain,

2  which he diagnosed as likely a volar ganglion (Tr. 324). An MRI confirmed a cyst, most

3  likely ganglion, along the volar radial survace of Plaintiff's left wrist (Tr. 328-29).

4    On September 4, 2001, Judith W. Heath, M.D., Plaintiff's primary care physician,

5  examined Plaintiff after Plaintiff was hit by a wheelchair at work and fell on her tailbone and

6  both hands, mostly the right side, on August 22, 2001 (Tr. 304). Plaintiff was sore in both

7  hands and wrists (Tr. 304). Plaintiff also reported experiencing panic episodes and shortness

8  of breath and sighing (<u>Id.</u>). Dr. Heath found Plaintiff's <u>right</u> wrist was very tender in the

9  snuffbox with no swelling and Plaintiff's <u>left</u> wrist had a ganglion cyst. (<u>Id.</u>). Dr. Heath

10 prescribed Zoloft, Midrin, and BuSpar; and ordered an x-ray of Plaintiff's right wrist (<u>Id.</u>).

11 The x-ray revealed no fractures, particularly no scaphoid fracture, and the ulnar joints and

12 soft tissues appeared normal (Tr. 308).

13    On September 17, 2001, Plaintiff visited Dr. Conklin for an evaluation of her

14 <u>right</u> wrist, which she reported was still injured due to her August 22, 2001 fall at work (Tr.

15 320). Dr. Conklin reported tenderness over the scapholunate interval of Plaintiff's right

16 sprain with evidence of radiocarpal and scapholunate sprain (Tr. 321). Regarding Plaintiff's

17 <u>left</u> wrist, Dr. Conklin advised Plaintiff to wait on the ganglion surgery for her right arm to

18 heal in order to have one healthy arm (<u>Id.</u>). For insurance purposes, Plaintiff chose to move

19 forward with surgery on her left wrist before her right wrist healed (<u>Id.</u>). That same day, Dr.

20 Conklin wrote a letter on Plaintiff's behalf to Nancy Oreshack at ASU West College of

21 Education explaining that Plaintiff was to undergo surgery on her left wrist, that there might

22 be a deeper pathology than the volar ganglion, that she was advised to avoid further stress

23 on her wrist, and that her recovery was expected to take six weeks to three months (Tr. 323).

24    On September 25, 2001, Dr. Conklin performed the excision of a volar ganglion from

25 Plaintiff's left wrist at Scottsdale Healthcare Osborn, while Plaintiff was under general

26 anesthesia (Tr. 278-79). Plaintiff was discharged later that same day (Tr. 280).

27

28

1    On October 1, 2001, Dr. Conklin examined Plaintiff's left wrist and found that the

2    surgical wound was healing well (Tr. 318).  Dr. Conklin advised Plaintiff to continue to wear

3    a splint while sleeping or whenever she was at risk of trauma to her wrist (Id.).  Dr. Conklin

4    released Plaintiff to work at a modified work status with no use of her left hand, limited use

5    as tolerated of her right hand, no climbing to unprotected heights, and no exposure of either

6    hand to power tools or pen active machinery (Id.).  On October 10, 2001, Dr. Conklin again

7    examined Plaintiff and found her left wrist surgical wound healed enough to remove her

8    sutures (Tr. 317).  Plaintiff was able to make a fist and she tolerated gentle range of motion

9    well (Id.).  Plaintiff chose home therapy (Id.).

10    On October 19, 2001, Dr. Heath examined Plaintiff's right wrist (Tr. 302).  Dr. Heath

11    found small effusion but no obvious fracture; she suggested the possibility of subluxation of

12    the scaphoid and a question of some edema of the lunate (i.e., bone bruise) and slight

13    widening of the scapholunate joint (Id.).  Dr. Heath recommended a wrist splint and follow-

14    up appointment with a hand surgeon (Id.).

15    On November 5, 2001, Plaintiff returned to Dr. Conklin for reassessment of her right

16    wrist pursuant to her August 21, 2001 fall at work (Tr. 316).  Dr. Conklin ordered an MRI,

17    the results of which suggested a slight rotatory subluxation of the scaphoid and mild

18    scapholunate widening, consistent with scapholunate injury which could possibly be a partial

19    or complete tear, but did not indicate any sort of fracture (Id.).  Dr. Conklin recommended

20    an arthrogram to rule out any sign of lunotriquetral tear, and then arthroscopy (Id.).  Dr.

21    Conklin declined Plaintiff's request to render his opinion of her impairment rating for

22    worker's compensation purposes but Dr. Conklin declined the request because Plaintiff was

23    not stationary at that time (Id.).

24    Dr. Conklin examined Plaintiff again on January 28, 2002 (Tr. 173-75).  Dr. Conklin

25    assessed Plaintiff as capable of working at a modified work duty status with limited use as

26    tolerated of the right hand, no pinching with the right thumb, no repetitive use of the right

27    hand, no lifting nor force greater than one pound with the right hand, no climbing to

28

1  unprotected heights, and no exposure of either hand to power tools or open active machinery

2  (Tr. 175).  On February 20, 2002, Dr. Conklin noted tenderness with scapholunate testing,

3  but no crepitus and no swelling of the wrist, but scchymosis consistent with her recent

4  arthrogram (Tr. 172).  Dr. Conklin stated that the results of the arthrogram were consistent

5  with scaphonuate ligament tear and mild widening (Id.).  Dr. Conklin recommended

6  scapholunate ligament reconstruction surgery but Plaintiff was hesitant to proceed because

7  she felt that her left wrist was markedly compromised following her auto accident (Tr. 172).

8  On April 10, 2002, Plaintiff was still undecided about having surgery on her right wrist (Tr.

9  168).  Dr. Conklin released Plaintiff for modified work status with limited use of her right

10  hand as tolerated (Tr. 168).

11      On June 20, 2002, Plaintiff underwent arthrosporic surgery for debridement of partial

12  tear of her right wrist scapholunate ligament and partial synovectomy, right wrist, radiocarpal

13  joint, which was performed by Dr. Conklin (Tr. 163-65).  Following the surgery, Plaintiff

14  attended nine physical therapy sessions at Desert Hand Therapy between July 8, 2002 and

15  July 25, 2002 (Tr. 281-89).  On July 21, 2002, Plaintiff's grip strength in her right hand was

16  reported to be fifteen pounds greater than before she participated in therapy (Tr. 282).

17      On September 4, 2002, Plaintiff underwent a Functional Capacity Evaluation,

18  performed by Murray Palmer at the Center for Musculoskeletal Medicine (Tr. 290-95).  Mr.

19  Palmer assessed Plaintiff as capable of performing work at the light physical demand level,

20  defined by the U.S. Department of Labor as occasional lifting up to twenty pounds, frequent

21  lifting (up to two-thirds of the time) up to ten pounds, and constantly lifting up to negligible

22  force of movement (Tr. 291).

23      On September 18, 2002, Dr. Conklin wrote an ICA Medical Discharge Report, noting

24  that Plaintiff reported she was back to her school activities and felt that she was comfortable

25  with the ICA discharge (Tr. 314).  Dr. Conklin found that Plaintiff had reached stationary

26  status, and had a permanent impairment secondary to mild loss of motion of her right wrist

27  (Tr. 314).  Based on the functional capacity evaluation provided by the Musculoskeletal

28

Medical Center, Dr. Conklin assessed Plaintiff as capable of working at a modified work status with no lifting or force greater than twenty pounds occasionally and ten pounds frequently (Tr. 314).

On September 20, 2002, Plaintiff was seen by her primary care physician, Dr. Judith Heath, during which time, Plaintiff conveyed that she was doing well (Tr. 298). Plaintiff reported that she was newly married after divorcing her third husband; she was back in school at ASU West and doing better; her panic was well-controlled, but her migraines were more frequent since school started (Tr. 298). On December 20, 2002, Plaintiff returned to Dr. Heath for a well woman examination and pap smear (Tr. 296-97). During this visit, Plaintiff reported that she had withdrawn from school due to panic attacks and vertigo in class (Tr. 296).

On October 18, 2002, Plaintiff was examined by Keith W. Cunningham, M.D., internal medicine specialist (Tr. 176-78). Dr. Cunningham described Plaintiff as somewhat agitated and at times condescending (Tr. 177). The examination was cut short when Dr. Cunningham asked Plaintiff to leave due to her failure to cooperate with him while he tried to obtain her medical history (Tr. 176).

On November 26, 2002, Plaintiff was examined by Atul Patel, M.D. (Tr. 179-83). During that examination, Plaintiff relayed to Dr. Patel that her last episode of vertigo, basilar type of migraine was six weeks earlier (Tr. 179). Plaintiff was unable to specify the number of migraine attacks she had experienced but did report that her present status was reasonably controlled (Tr. 179). Plaintiff stated that stress caused her attacks and referred to her failed attempt to attend college that fall (Tr. 179). Dr. Patel found that Plaintiff had full functional range of motion in her shoulders, elbows, wrists, intrinsic joints, hips, knees, and ankles (Tr. 180). Dr. Patel concluded that Plaintiff had a history of bilateral hand and wrist injuries, basilar migraines, and panic disorder (Tr. 181). In light of Plaintiff's panic disorder, Dr. Patel recommended a psychological evaluation (Id.).

1    On January 22, 2003, Plaintiff underwent a consultative metal status examination by

2    Carl C. Mansfield, Ph.D. (Tr. 184-87).  After the examination, Dr. Mansfield assessed

3    Plaintiff as having panic disorder with mild agoraphobic symptoms (Tr. 185).

4    In the Medical Source Statement of Ability to Do Work appended to his narrative

5    report, Dr. Mansfield indicated that Plaintiff's condition was "fair: seriously limited but not

6    precluded" for the following subcategories under the main category, Making Occupation

7    Adjustments: relate to co-workers; deal with the public; interact with supervisors; deal with

8    work stresses; function independently; maintain attention/concentration (Tr. 186).  Dr.

9    Mansfield checked the "Good: limited but satisfactory" box for the following subcategories

10   in that section: follow work rules; use judgment (Tr. 186).

11   In the category, Making Performance Adjustments, Dr. Mansfield rated Plaintiff as

12   "good" in the category "understand, remember and carry out simple job instructions, and

13   maintain personal appearance; and demonstrate reliability (Tr. 187). In that same category,

14   Dr Mansfield rated Plaintiff "fair" in the following areas: understand, remember and carry

15   out complex job instructions; understand, remember and carry detailed, but not complex job

16   instructions; behave in an emotionally stable manner; and relate predictably in social

17   situations (Id.).

18   On January 30, 2003, State Disability Determination Specialist ("DDS") psychologist

19   Francis A. Enos, Ph.D. reviewed Plaintiff's medical records and completed a Psychiatric

20   Review Technique Form (PRTF) (Tr. 188-200) and a Mental Residual Functional Capacity

21   Assessment (MRFCA).  Dr. Enos determined that Plaintiff had a medically determinable

22   impairment, panic disorder with mild agoraphobia (Tr. 188, 193).  Dr. Enos concluded that

23   Plaintiff's condition was mild (Id.).

24   On April 14, 2003, Jane George, Ph.D., a psychological consultant for the DDS,

25   completed a PRTF (Tr. 206-19) and a MRFCA (Tr. 220-22).  Dr. George reported that the

26   record reflected evidence of anxiety-related disorders (Tr. 206, 211).  Dr. George reported

27

28                                           - 11 -

1  evidence of anxiety-related disorder but found that it only mildly restricted activities of daily

2  living (Tr. 206, 216).

3  II.      THE HEARING TESTIMONY

4         During the initial hearing on January 14, 2004, Plaintiff testified that she is left-

5  handed (Tr. 344). Plaintiff testified that she stopped driving approximately three years before

6  the hearing because of panic attacks and vertigo (Id.). Plaintiff stopped working on August

7  21, 2001, after she injured her right hand in an accident at work (Tr. 347). Plaintiff had

8  previously injured her left wrist in a 1996 motor vehicle accident (Id.).

9         Plaintiff returned to work after Dr. Meyer performed surgery on her left wrist (Tr.

10  348), however, Plaintiff was not able to use her left hand "normally" due to "extreme pain"

11  when bending or twisting her wrist (Id.). Plaintiff testified that she was not able to lift

12  cooking pots and she used two hands to pick up a coffee cup or a soda can (Tr. 351).

13        Plaintiff testified that she experienced vertigo several times a week, with no known

14  precipitating factors (Tr. 353). When she experienced a vertigo episode, she had to hold onto

15  something to prevent falling down (Id.). Plaintiff believed she began experiencing problems

16  with vertigo after her 1996 vehicle accident (Id.).

17        Plaintiff was no longer able to perform household chores such as dusting, sweeping,

18  making beds, and doing laundry (Tr. 355). She often received help from her mother for these

19  tasks (Id.). In fact, Plaintiff's mother, who lived about ten minutes away, helped Plaintiff

20  with chores a couple time per week (Tr. 361). Plaintiff no longer would grocery shop by

21  herself because she did not drive and she worried about having a panic attack and vertigo

22  because of the people around (Tr. 356). Plaintiff used to work out but could no longer run

23  on a treadmill because of a weak balance system (Tr. 356). In fact, she sometimes had

24  trouble walking (Tr. 357).

25        Plaintiff enjoyed recreational reading and watching television (Tr. 357). She no

26  longer could counter cross-stitch because it required fine motor skills in her hands (Id.).

27  Plaintiff stated that she and her husband do not go out to eat, they rent movies and rarely go

28                                           - 12 -

out to a movie theater (Tr. 361). She said that she rarely leaves the house and she does not socialize with friends (Tr. 361).

When asked about the September 2002 Functional Capacity Evaluation by Mr. Palmer, Plaintiff stated that she did not recall picking up a bucket with a handle using only her right hand (Tr. 399-401). Plaintiff further did not remember putting dots in a one-eighth inch diameter circle (Tr. 401). Plaintiff stated that Mr. Palmer told her at the end of the test that he was reporting that she could perform "light capacity" even though he knew it was not true, because otherwise, in the future, no one would hire her (Tr. 405). Plaintiff stated that Mr. Palmer's summary "totally false" (Tr. 405).

At the supplemental hearing on April 15, 2004, Plaintiff testified that her symptoms had not improved in the year and a half since Dr. Health noted that Plaintiff withdrew from classes at ASU West (Tr. 407). Nor had there been any significant change since the January 2004 hearing three months earlier (Tr. 405-06). Plaintiff stated that she tried to take classes at Arizona State University West, but had to withdraw due to panic attacks and vertigo.

A.    MEDICAL EXPERTS

Clifford J. Harris, M.D., testified at the first hearing on January 14, 2004 and completed a medical expert Questionnaire. Defendant objected to Dr. Harris' testimony because he testified without having reviewed Plaintiff's complete medical records.

Neurologist Hershel Goren, M.D., was on standby to testify telephonically at the supplemental hearing on April 15, 2004. Plaintiff's attorney objected to Dr. Goren's testimony on the ground that he was not an orthopedic specialist.

Without ruling on the validity of counsel's arguments, the ALJ declined to have the medical expert testify. Instead, the ALJ decided the case without considering the testimony of either medical expert. The ALJ also struck from the record the medical expert Questionnaire completed by Dr. Harris and the medical expert Questionnaire completed by Dr. Goren.

B.      VOCATIONAL EXPERTS

Vocational Expert ("VE") Maude Prall testified at the first hearing on January 14, 2004.  VE Prall testified that Plaintiff's past work as a special education teacher's aide was heavy work as Plaintiff described it but only light, semiskilled work as it is described in the Dictionary of Occupational Titles ("DOT").  VE Prall stated that Plaintiff's past work as a receptionist with special education kids could reach into medium work, but primarily it would be considered sedentary, semiskilled work.  Finally, home care provider would be light, semiskilled work as the DOT describes it and medium to heavy as Plaintiff described performing it.  Only the skills acquired during Plaintiff's clerical work and her work with children would be transferable.

The ALJ posed a series of hypothetical questions to VE Prall.  When VE Prall was asked about a person who could lift twenty pounds occasionally, ten pounds frequently, sit, stand, and/or walk six hours in an eight-hour day with no exposure to hazards, VE Prall ruled out work as a receptionist but found that work as a teacher aide or a special home care provider would be appropriate.  When the hypothetical changed to limit a person to lifting less than ten pounds occasionally or frequently, sitting, standing, and/or walking six hours in an eight-hour day; and again, restricting exposure to hazards, VE Prall excluded work as a teacher's aide but allowed work as a receptionist.  When the hypothetical added lower stress work, production quotas but not high production quotas, and minimum contact with the public, VE Prall excluded work as a receptionist and a teacher's aide.  Finally, when the hypothetical changed to allow a person to miss four or more days a month, or a person could not complete assigned tasks in an eight-hour day four or more days a month, VE Prall responded that no work would be available without special accommodation.  VE Prall stated that her testimony was consistent with the DOT.

At the supplemental hearing on April 15, 2004, David Janus, VE, testified.  In response to a series of hypothetical questions posed to him by the ALJ, VE Janus stated that Plaintiff's limitations restricted her from performing any of her previous work.  VE Janus

- 14 -

1   opined that Plaintiff could work as a parking lot attendant or a counter clerk. When asked

2   about an individual missing four or more days of work per month or cannot complete

3   assigned tasks in an eight-hour day, four or more days per month, VE Janus stated that there

4   would be no work available.  On cross-examination, VE Janus testified that a counter clerk

5   position would require bilateral manual dexterity, but a parking lot attendant position would

6   not.  VE Janus testified that a counter clerk position requires an adequate pace and fairly

7   moderate pace, which is not realistic for a person with a moderate limitation in ability to

8   maintain concentration, persistence or pace.

9   III.   THE ALJ'S CONCLUSIONS

10       The ALJ initially noted that Plaintiff filed an application for Disability Insurance

11   Benefits and Supplemental Security Income on April 2, 2002, alleging an inability to work

12   since August 21, 2001.  The ALJ then noted that records indicate that Plaintiff has not

13   engaged in substantial gainful activity at any time since she was first disabled on August 21,

14   2001.

15       The medical evidence indicates that Plaintiff has remote left wrist disorder, right wrist

16   disorder, mild panic disorder, and history of vertigo and headaches.  These medically

17   determinable impairments are considered to be severe under the Social Security Act and

18   Regulations.  The ALJ stated that although Plaintiff has impairments that are considered to

19   be severe, the impairments are not attended with the specific findings required to meet or

20   equal an impairment listed is Appendix 1 of the Regulations (20 CFR, Part 404, Subpart P,

21   Appendix 1).  The ALJ made this determination after it considered the opinions of the State

22   agency medical consultants who evaluated this issue at the initial and reconsideration levels

23   of the administrative review process.

24       As summarized by the ALJ, Plaintiff previously injured her left wrist in October 1996.

25   However, Plaintiff's subsequent MRI of her left wrist was normal.  Plaintiff underwent an

26   arthroscopy of the left wrist in October 1996.  Plaintiff was diagnosed with traumatic

27   cartilage loss off the carpus on the left wrist.  Plaintiff had a second MRI of her left wrist on

28

1   August 31, 2001 to evaluate a ganglion, which needed to be removed.  The MRI showed
2   Plaintiff's carpal tunnel and Guyon's canal were normal.  In September 2001, Plaintiff
3   underwent surgery to remove a ganglion from her left wrist.

4       The ALJ further summarized Plaintiff's medical history as follows.  The Plaintiff
5   injured her right wrist at work on August 21, 2001, when she fell and hurt her back and
6   hands.  She had a prior right carpal tunnel release on December 12, 1997.  Preoperative
7   imaging and work up was consistent with right wrist scapholunate ligament sprain.  On June
8   20, 2002, Plaintiff underwent arthroscopic surgery on her right wrist.  A progress report on
9   July 29, 2002 indicated that the surgery wound was healing nicely.

10      The ALJ noted that Plaintiff has a history of experiencing vertigo and headaches.
11  Medical records in October 1999 showed Plaintiff's brain MRI was unremarkable.  Plaintiff
12  cannot tolerate even a low dose of Procardia or other migraine medications.  There are no
13  current treatment records for these conditions.

14      The ALJ noted that Plaintiff has not had any mental health treatment since her alleged
15  onset of disability despite her complaints of having a panic disorder.  At the State's request,
16  Plaintiff underwent a consultative psychological evaluation on January 22, 2003 with
17  Licensed Clinical Psychologist Dr. Mansfield.  Plaintiff reported that she began having panic
18  attacks after her involvement in a motor vehicle accident in 1996.  Plaintiff stated that any
19  type of stress could instigate a panic attack.  Plaintiff also experiences vertigo, which has
20  caused Plaintiff to fall when she has walked unassisted.  Dr. Mansfield diagnosed Plaintiff
21  with panic disorder and mild agoraphobic symptoms.

22      The ALJ found that the objective medical evidence and abnormal clinical findings
23  from August 21, 2001 to September 18, 2002 (the "closed period") support the residual
24  functional capacity limitation such that she could perform a limited range of "sedentary"
25  exertional work.  Specifically, Plaintiff could lift and carry no more than ten pounds at a time
26  occasionally and frequently; walk and/or stand about six hours in an eight-hour workday; and

27

28

sit for six hours out of an eight-hour workday.  Moreover, she could not work near hazards and is limited to occasional fine and gross manipulation.

The ALJ noted and accepted the VE testimony that Plaintiff's residual functional capacity during the closed period precluded Plaintiff from performing her past work as a special education aide (light semi-skilled work); a home care provider (medium semi-skilled work); and as a receptionist (sedentary semi-skilled work).  The ALJ also accepted the VE's finding that Plaintiff could not perform any other work in the national economy during the closed period.  Thus, the ALJ found Plaintiff was disabled during the period between August 21, 2001 and September 18, 2002.

The ALJ found that the record reflects a decrease in Plaintiff's medical signs and symptoms and an increase in her ability to perform work-related activities beginning September 19, 2002.  In fact, the ALJ determined that Plaintiff regained the residual functional capacity to perform "light" exertional work as of September 19, 2002.  Specifically, the ALJ found that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit for six hours total in an eight-hour day; and stand/walk for six hours in an eight-hour day.  Plaintiff is precluded from hazards and frequent fine and gross manipulations but has no mental limitations.

The ALJ stated that Plaintiff's medical records indicate that Plaintiff was discharged from medical care for her right wrist on September 18, 2002.  In fact, Plaintiff's treating physician, Dr. Conklin, reported that Plaintiff's right wrist had reached a stationary status.  The ALJ stated that after September 18, 2002, there are no current treatment records of Plaintiff's left wrist, nor complaints of vertigo or migraine headaches.  The ALJ states that the dearth of medical records after September 18, 2002 indicates that Plaintiff's limitations and problems are not as severe as alleged.

The ALJ found that during Plaintiff's residual functional evaluation at the Center for Musculoskeletal Medicine, it was determined that Plaintiff's perception of her pain was 100 percent greater than the degree to which it limited function as tested on the numeric pain

1    scale and visual analog pain scale. The ALJ found that this incongruence serves to lessen
2    Plaintiff's credibility regarding her pain level.

3    After reviewing this evidence, the ALJ concluded that Plaintiff has only mild
4    restrictions in her activities of daily living and mild difficulties in maintaining social
5    functioning. The ALJ noted that Plaintiff is independent in her self care and housekeeping,
6    and that she helped her husband care for his teenage autistic daughter three days a week. The
7    ALJ further stated that Plaintiff testified that she **socialized with her family and was able to**
8    **drive, read, watch television, and go to the movies. The ALJ also stated that Plaintiff**
9    **attended classes at ASU, which, the ALJ states, suggests Plaintiff has the ability to deal with**
10   **people, contrary to her allegations. Moreover, the ALJ expressed that Plaintiff was able to**
11   **drive, read, watch televison and go to the movies.**

12   The ALJ found Plaintiff's description of her physical functional limitations during the
13   period from August 21, 2001 to September 19, 2002 consistent with the record and generally
14   credible during this closed period. The ALJ found Plaintiff's treating physician Dr. Conklin's
15   opinion to be credible. Whereas the ALJ was not persuaded by the Center for
16   Musculoskeletal Medicine's determination of Plaintiff's residual functional capacity
17   determination, finding it to be inconsistent with the evidence as a whole.

18   In sum, the ALJ concluded that Plaintiff was disabled from August 21, 2001 to
19   September 18, 2002 and was entitled to Disability Insurance Benefits for that period of time
20   only. Further, the ALJ found that, as of September 19, 2002, Plaintiff's medical condition
21   improved to the point that she was able to perform her past work. Therefore, the ALJ found
22   that Plaintiff was only eligible for benefits for the closed period of August 21, 2001 to
23   September 18, 2002.

24                                    DISCUSSION

25   Plaintiff contends that the ALJ did not accurately and lawfully account for all of
26   Plaintiff's medical problems, did not properly assess Plaintiff's realistic overall ability to
27   function, and did not properly analyze Plaintiff's capacity for employment. Furthermore,

28

1    Plaintiff asserts that this Court must determine whether Plaintiff received a full and fair

2    hearing because – after Dr. Harris' testimony was disallowed at the first hearing and Dr.

3    Goren's did not testify at the second hearing – the ALJ made his determination without

4    hearing testimony from a medical expert.

5         Defendant asserts that the ALJ's determination that Plaintiff could perform her past

6    relevant work after September 18, 2002 was supported by substantial evidence and free of

7    error.  Defendant argues that the ALJ properly resolved the medical evidence; that the ALJ

8    provided clear and convincing reasons, supported by substantial evidence, for discounting

9    Plaintiff's pain complaints after September 18, 2002, and that substantial evidence supported

10   the ALJ's finding that Plaintiff could perform her past relevant work.

11   I.    THE ALJ'S RESOLUTION OF THE MEDICAL EVIDENCE

12        Plaintiff contends that the ALJ did not resolve conflicts between the medical evidence

13   presented by Drs. Meyer, Bodell, Lipton, Conklin, and Patel regarding Plaintiff's limited use

14   of her left hand.  Plaintiff cites Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006),

15   citing Lester v. Charter, 81 F.3d 821, 830-31 (9th Cir. 1995), to argue that "the opinion of an

16   examining doctor, even if contradicted by another doctor, can only be rejected for specific

17   and legitimate reasons that are supported by substantial evidence in the record."

18        The ALJ has authority to resolve conflicting or ambiguous medical evidence.

19   Andrews v. Shalala, 1035 F.3d 1039-40 (9th Cir. 1995).  In reporting it's decision, the ALJ

20   need not discuss every piece of evidence.  Howard ex rel. Wolff v. Barnhart, 241 F.3d 1006,

21   1012 (9th Cir. 2003).  The ALJ need only explain why he rejected significant, probative

22   evidence.  Vincent ex rel. Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984).

23        Here, the ALJ was not required to address evidence outside the relevant time frame,

24   such as the reports from Drs. Meyer and Bodell issued in 1996 and 1997, respectively, when

25   determining Plaintiff's medical status in 2002.  Furthermore, the ALJ did consider Plaintiff's

26   treating physician's opinion and found that on September 18, 2002, Dr. Conklin reported that

27   Plaintiff's condition had reached stationary status.  The ALJ also considered that, based on

28                                                    - 19 -

1   the evaluation provided by the Musculoskeletal Medical Center, Dr. Conklin also reported

2   that Plaintiff was capable of working at a modified work status with no lifting or force

3   greater than twenty pounds occasionally and ten pounds frequently.  Therefore, the Court

4   does not find compelling Plaintiff's argument that the ALJ's opinion must be reversed merely

5   because he did not address evidence from Drs. Meyers and Bodell.  Nor is the Court

6   convinced by Plaintiff's argument that the ALJ erred by not considering the opinion of

7   Plaintiff's treating doctor, which the Court finds that the ALJ did consider.

8       With regard to Plaintiff's shoulder injury, Defendant asserts that Plaintiff bore the

9   burden of producing evidence of a disabling impairment and she failed to carry her burden

10  with regard to a sustained shoulder injury.  During Steps I through IV of the determination,

11  Plaintiff bore the burden.  <u>Bowen</u>, 482 U.S. at 140-41 (<u>citing</u> 20 C.F.R. §§ 404.1520(b)-(f)).

12  It is not until Step V that the burden shifts to Defendant.  <u>Penny v. Sullivan</u>, 2 F.3d 953, 956

13  (9th Cir. 1993).  Plaintiff presented evidence of a shoulder injury at its onset in August 2001

14  but she does not provide more recent evidence to show that her shoulder continues to cause

15  her pain and disability.  This is the case despite numerous doctor visits including to

16  orthopedic specialists.  Fair inferences may be drawn from the evidence.  <u>Orteza v. Shalala</u>,

17  50 F.3d 748, 750 (9th Cir. 1995).  Having found no post-1997 evidence of shoulder problems,

18  this Court finds that the ALJ appropriately found that Plaintiff's shoulder was not an

19  impairment after the closed period.  Thus, the Court finds that Plaintiff has not overcome her

20  burden of proving disability with regard to her shoulder injury.

21      Regarding the opinion of consultative examiner Dr. Mansfield, Plaintiff contends that

22  the ALJ improperly rejected Dr. Mansfield's opinion regarding Plaintiff's mental

23  impairments.  As stated above, Dr. Mansfield concluded that Plaintiff has a panic disorder

24  with mild agoraphobic symptoms (Tr. 185).  The ALJ found that despite Plaintiff's claims

25  of experiencing panic attacks, and vertigo she has not undergone any mental health treatment

26  since the alleged 1996 onset date.  Defendant asserts that Dr. Mansfield's opinion was not

27  based on clinical findings but on Plaintiff's subjective complaints of experiencing pain.

28

1    Contrary to the ALJ's finding and to Defendants assertion, this Court finds sufficient
2    evidence of Plaintiff's ongoing fight with panic disorder and vertigo, and that Plaintiff sought
3    treatment for her panic disorder.  In fact, on December 20, 2002, Plaintiff's primary care
4    physician, Dr. Heath, reported that Plaintiff dropped out of school due to panic attacks and
5    vertigo in class (Tr. 296).  Further evidence comes from Dr. Patel on November 26, 2002,
6    when he found Plaintiff suffered from a panic disorder (Tr. 181).  In fact, Dr. Patel
7    recommended a psychological evaluation to address Plaintiff's disorder, which was the
8    impetus for Dr. Mansfield examining Plaintiff  (Id.).  As stated above, Dr. Mansfield
9    examination resulted in a diagnosis that Plaintiff has a panic disorder with mild agoraphobic
10   symptoms (Tr. 185).  The Court finds that the record includes corroborating evidence from
11   doctors in addition to Dr. Mansfield who found that Plaintiff suffers from panic attacks,
12   caused by stress.  Therefore, the Court finds that the ALJ improperly disregarded Dr.
13   Mansfield's assessment of Plaintiff's panic disorder with mild agoraphobic symptoms.

14       Furthermore, the ALJ stated that Plaintiff's testimony was not convincing because,
15   despite her pain, Plaintiff was able to socialize with her family, drive, and go to the movies,
16   among other things.  The ALJ also reported that Plaintiff attended classes at ASU, which, the
17   ALJ states, suggests, contrary to her allegations, that she can deal with people without feeling
18   anxiety.  The ALJ further stated that after September 18, 2002, there are no current treatment
19   records of Plaintiff's left wrist, nor complaints of vertigo or migraine headaches.  The ALJ
20   also found that the dearth of medical records after September 18, 2002 indicates that
21   Plaintiff's limitations and problems are not as sever as alleged.

22       However, the Court disagrees with these assessments and findings.  In fact, Plaintiff
23   reported to her doctors and at the hearing that she did not socialize, nor drive, nor go to the
24   movies.  Though Plaintiff reports that her mother visits twice a week, the purpose for the
25   visits is to help Plaintiff with household chores, not to socialize.  Further, Plaintiff's son
26   sometimes drives her places but, again, this is more out of necessity rather than as a social

27

28                                    - 21 -

1  outing.  The ALJ also overlooked that, though Plaintiff began attending colleges classes, she

2  was forced to withdraw due to panic attacks and vertigo.

3           The Court also disagrees with the ALJ's assertion that the absence of medical records

4  after September 18, 2002 indicates that Plaintiff's limitations and problems are not as severe

5  as alleged.  On that date, Dr. Conklin found that Plaintiff's wrists had reached stationary

6  status.  In other words, there was no more that doctors could do to improve Plaintiff's wrists,

7  despite the impairment.  Therefore, it was no longer necessary for Plaintiff to visit the doctor

8  as regularly because the damage was permanent.  Thus, it is understandable that the number

9  of doctor's visits would diminish.  For the forgoing reasons, the Court finds that the ALJ's

10 decision was against the substantial evidence in the record and improperly terminated

11 Plaintiff's benefits award.

12 II.    PLAINTIFF'S OVERALL ABILITY TO FUNCTION AND HER CAPACITY FOR
        EMPLOYMENT
13

14          Plaintiff asserts that the ALJ committed material errors of fact and law by concluding

15 that Plaintiff had regained the capacity to perform her past work as a receptionist after

16 September 18, 2002.  The Court agrees that the evidence of limitations reported by Dr.

17 Mansfield and Dr. George, along with the vocational opinions of VEs Prall and Janus

18 indicating impairments that restrict Plaintiff's ability to work at any of her previous positions

19 or any other position without special accommodations.

20 III.   **CONCLUSION**

21          The Court concludes that the ALJ improperly ended Plaintiff's benefits award on

22 September 22, 2002.  The Court finds that Plaintiff continues to be disabled due to her panic

23 disorder with mild agoraphobic symptoms as diagnosed by Dr. Mansfield and supported by

24 substantial evidence in the record.  Accordingly,

25          **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 12)  is

26 granted.

27

28
                                          - 22 -

1    **IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary

2    Judgment (Doc. 14) is denied.

3    **IT IS FURTHER ORDERED** that Plaintiff's request for oral argument is denied.

4    **IT IS FURTHER ORDERED** that the ALJ's decision to deny benefits for the period

5    of after September 18, 2002 is reversed and this matter is remanded for calculation and

6    payment of benefits in a manner consistent with this Order.

7    **IT IS FURTHER ORDERED** that Judgment shall be entered consistent with this

8    Order.

9    DATED this 26th day of March, 2007.

10

11

12

13    _____
      Mary H. Murguia
      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28